# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| DAVID CORDER, | ) | |
| | ) | |
| Plaintiff, | ) | No. 05 C 3893 |
| | ) | |
| vs. | ) | |
| | ) | Mag. Judge Michael T. Mason |
| JO ANNE BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Plaintiff, David Corder ("Corder" or "claimant"), has brought a motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Corder's claim for Supplemental Security Income payments under sections 1602 and 1614(a)(3)(A) the Social Security Act ("SSA"), 42 U.S.C. §§ 1381a and 1381c(a)(3)(A). The Commissioner filed a cross motion for summary judgment asking that we uphold the decision of the Administrative Law Judge. We have jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons set forth below, claimant's motion for summary judgment is granted in part and denied in part and the Commissioner's motion for summary judgment is denied.[1]

**Procedural History**

---

[1] By the parties' consent, on September 23 and 30, 2005, this case was reassigned to this Court, pursuant to 28 U.S.C. § 636(c)(1) and Northern District of Illinois Local Rule 73.1(b), to conduct any and all proceedings and to enter final judgment (Dkt. # 22).

On June 1, 1993, Corder filed applications for SSI and Disability Insurance Benefits ("DIB") alleging that he became disabled on September 15, 1986 due to back problems, alcoholism and asthma.[2] (R. 37-40, 41-44, 78). His applications were denied initially and upon reconsideration. (R. 58-65, 69-74). Corder filed his Request for Hearing on April 18, 1994. (R. 75). On March 9, 1995, Corder appeared with counsel before Administrative Law Judge Alan L. Jonas who issued an unfavorable decision for Corder. (R. 28-32, 211-225, 398-431). Corder filed a request for review, and on April 2, 1997, the Appeals Council remanded the case to an ALJ for further review. (R. 230, 231-33).

On June 11, 1998, Corder appeared with counsel before ALJ Jonas who issued a second unfavorable decision for Corder on November 19, 1998. (R. 10-27, 444-458). Corder filed a Request for Review, which was denied by the Appeals Council on March 2, 2000. (R. 7-9). Thus, ALJ Jonas' decision became the final decision of the Commissioner, subject to judicial review.

On May 4, 2000, Corder filed a complaint in the Northern District of Illinois seeking judicial review of the final decision of the Commissioner denying his application for SSI. (R. 575-76). The parties consented to the jurisdiction of Magistrate Judge Schenkier. On May 4, 2001, Judge Schenkier issued a Memorandum Opinion and Order reversing the Commissioner's final decision and remanding the matter for further proceedings to make a finding regarding the extent of Corder's impairments, the extent to which those impairments impact Corder's ability to work, and the work available to Corder given those

---

[2]On April 17, 1998, Corder amended the onset date of his alleged disability to October 1, 1992 and informed the Agency that he had abandoned his DIB claim and would pursue only his SSI claim. (R. 14, 374).

2

limitations. (R. 650-75); *Corder v. Halter*, 2001 U.S. Dist. LEXIS 5718 at *43 (N.D. Ill. May 4, 2001).

On remand, the matter was reassigned to ALJ Maren Dougherty ("ALJ"). The ALJ held two administrative hearings and heard testimony from Corder, a medical expert and a vocational expert. (R. 482-529, 530-48). On September 26, 2003, the ALJ found Corder not disabled. (R. 459-79). Corder did not file exceptions to the Appeals Council, and the Appeals Council did not take jurisdiction over the matter, leaving ALJ Dougherty's decision as the final decision of the Commissioner. 20 C.F.R § 416.1484.

On January 5, 2004, Corder filed a second complaint in the Northern District of Illinois seeking judicial review of the final decision of the Commissioner denying his application for SSI. On May 3, 2004, Judge Conlon issued a Memorandum Opinion and Order and remanded the case to the Social Security Administration for further proceedings. (R. 795-809); *Corder v. Barnhart*, 2004 U.S. Dist. LEXIS 8285, 97 Soc. Sec. Rep. Service 507 (N.D. Ill. 2004). Judge Conlon found that the record substantially supported the ALJ's residual functional capacity ("RFC") determination that Corder had no limitations with respect to sitting, standing or walking. (R. 805); *Corder*, 2004 U.S. Dist. LEXIS 8285 at *17. However, Judge Conlon reversed the ALJ's final decision pertaining to Corder's mental capacity and the impact of his mental impairments on his RFC. (R. 806-08); *Corder*, 2004 U.S. Dist. LEXIS 8285 at *21-22. Judge Conlon remanded the case for further proceedings with respect to Corder's non-exertional limitations in an assessment of his RFC. (R. 808); *Corder*, 2004 U.S. Dist. LEXIS 8285 at *22.

On April 8, 2005, Corder again appeared with counsel for another administrative hearing before ALJ Dougherty. (R. 869-909). On April 29, 2005, ALJ Dougherty issued

an unfavorable decision for Corder. (R. 772-85). Corder did not file exceptions to the Appeals Council, and the Appeals Council did not take jurisdiction over the matter, leaving ALJ Dougherty's decision as the final decision of the Commissioner. 20 C.F.R § 416.1484. On July 13, 2005, Corder filed a third complaint in the Northern District of Illinois seeking judicial review of the final decision of the Commissioner denying his application for SSI.

**Factual Background**

Corder was born on April 10, 1958. (R. 37). He completed the tenth grade. (R. 476, 783). Corder's past employment consists of work as a factory worker and serviceman. (R. 86). This work involved frequent to constant standing, walking, and bending. (R. 86-91). Corder has not been employed since 1986. (R. 86). Corder has complained of lower back pain since the age of 25. (R. 797). Corder also has a history of alcohol dependency; in 1993, he reported that he drank up to twenty-four beers a day. (R. 112). However, Corder has been sober since April 1, 1995. (R. 15).

**Medical History Pertaining to Corder's Mental Health**

Corder has been examined by several mental health professionals since filing his SSI claim. In 1993, Dr. Diamond, a psychologist, examined Corder. (R. 159-175). Dr. Diamond administered a Wechsler Adult Intelligence Scale-Revised ("WAIS-R") IQ test. (R. 160). Corder scored 71 verbal, 76 performance and 72 full scale. *Id.* Corder's subtest scores on the WAIS-R were as follows: Information-4; Digit Span-7; Vocabulary-4; Arithmetic-5; Comprehension-3; Similarities-4; Picture Completion-4; Picture Arrangement-5; Block Design-5; Object Assembly-5; Digit Symbol-6. (R. 161). Dr. Diamond noted that Corder's Verbal skills fall very close to the mild mentally retarded range and are quite poor.

(*Id.*). Dr. Diamond also noted that Corder showed consistent borderline scores in assembly skills, eye-hand coordination tasks, and the ability to understand details in pictures. (*Id.*).

Dr. Diamond also administered the Wide Range Achievement Test-Revised ("WRAT"). (*Id.*). Dr. Diamond reported that Corder's scores on the WRAT were low and that Corder's WRAT scores indicated that Corder possessed below third grade reading and spelling skills and fifth grade math skills. (*Id.*). Dr. Diamond also reported that Corder possessed poor reasoning skills and a limited vocabulary. (*Id.*).

On May 21, 1997, Dr. Mary Gardner examined Corder and diagnosed him as possessing borderline intellectual functioning. (R. 248-52). Dr. Gardner also administered the WAIS-R and WRAT tests. (R. 250). Corder's scores on the WAIS-R were: 74 verbal; 74 performance; 73 full scale. (*Id.*). Corder's subtest scores on the WAIS-R were as follows: Information-3; Digit Span-6; Vocabulary-6; Arithmetic-6; Comprehension-5; Similarities-5; Picture Completion-4; Picture Arrangement-4; Block Design-5; Object Assembly-no score; Digit Symbol-5. (*Id.*). Dr. Gardner reported that the Information subtest score placed Corder in the mentally retarded range. (*Id.*). Dr. Gardner also reported that Corder's WRAT scores indicated that Corder possessed a fourth grade reading level and a fifth grade math level. (*Id.*). Dr. Gardner reported that Corder had memory problems. (R. 252). Dr. Gardner also stated that Corder's ability to remember locations, work-like procedures and to concentrate was limited. (R. 263).

**Medical Expert Testimony**

In May 2003, Daniel Schiff, M.D., a psychiatrist, gave the following testimony in response to a question from the ALJ regarding Corder's mental impairments:

> Q. In terms of functional, what does that borderline

> intellectual functioning – what would that do in terms of functional restrictions in the workplace?
>
> A. Well, let me approach it somewhat obliquely. This gentleman now says he cooks, he drives, he shops, he fishes, watches TV although he can't remember some of the plots, so I suspect he could do simple tasks. He could probably do one-step operation, two-step operation. They do not require intensive concentration or long-term memory, and I draw the line at that point.

(R. 518).

At the administrative hearing held in April 2005, the ALJ recalled Dr. Schiff to clarify his testimony from May 2003. Dr. Schiff testified that his statement "I draw the line at that point" meant that performing one or two step operations was where he would draw the line of speculation without further inquiry into Corder's ability to do operations. (R. 878). Dr. Schiff opined that based on Corder's IQ test scores, Corder was capable of the full range of unskilled work activity, including six to seven-step operations, if given a full thirty days to learn the steps.[3] (R. 875-78). Dr. Schiff based his opinion on his experience with juvenile criminal offenders who, like Corder, had IQ scores in the 70's and were able to comprehend information even though they did not learn it all in one step. (R. 877).

On cross examination, Corder's attorney questioned Dr. Schiff about Corder's WAIS-R IQ subtest scores and Dr. Schiff's familiarity and experience interpreting IQ subtest

---

[3]The Social Security regulations define unskilled work as work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, the Social Security Administration considers jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. 20 C.F.R. § 416.968(a). A person does not gain work skills by doing unskilled jobs. *Id.*

6

scores. (R. 878-83). Dr. Schiff testified that he had not reviewed substest score materials in a long time; that he was not an expert in subtest scores; and that he drew "a blank" when asked what the verbal subtest of Comprehension measures. (R. 880). Dr. Schiff further testified that with respect to his experience working with juveniles, he had not made correlations between subtest scores on IQ tests and the individuals' capabilities. (R. 882).

**Vocational Expert Testimony**

At the administrative hearings held in May and July 2003, James Radke ("Radke"), a vocational expert, testified about the capabilities of a hypothetical individual with the same vocational factors as Corder. (R. 522). Radke was told the hypothetical individual was between the ages of thirty-five and forty-five, and he had the same work experience as Corder. (*Id.*). While the hypothetical individual had an eleventh grade education, he could only read at the third grade level and perform math at the fifth grade level. (*Id.*). Additionally, the hypothetical individual could lift up to twenty pounds occasionally and ten pounds frequently. (*Id.*). Such individual could sit, stand, or walk as required by a job, as long as the job did not require more than occasional bending to the floor. (*Id.*). Finally, the hypothetical individual could only perform simple operations and could not be exposed to concentrated pulmonary irritants. (*Id.*). Radke testified that this hypothetical individual could perform the following unskilled light jobs in the regional economy: food preparation worker (10,500 jobs); library clerk (2,100 jobs); mail clerk (3,400 jobs); packer (11,000 jobs); and assembler (15,000 jobs). (*Id.*).

At the administrative hearing held in April 2005, Allen Searles ("Searles"), a vocational expert, testified. (R. 892). The ALJ presented Searles with the same hypothetical that she presented to Radke: someone of Corder's age at the time, 35-45

(Corder was 47 or 48 in 2005); an eleventh grade education but can only read at the third grade level and perform math at the fifth grade level; lift twenty pounds occasionally and ten pounds frequently; sit, stand, or walk in a job that does not require more than occasional bending to the floor; cannot work where they are exposed to concentrated pulmonary irritants; and could not perform more than simple operations. (R. 896). Searles agreed with Radke's prior testimony that such a hypothetical individual could perform unskilled job tasks. (*Id.*).

The ALJ restated Radke's previous testimony that such hypothetical individual could perform the following jobs: food preparation worker (10,500 jobs); library clerk (2,100 jobs); mail clerk (3,400 jobs); packer (11,000 jobs); and assembler (15,000 jobs). (*Id.*). The ALJ then asked Searles to identify the effects, if any, when the first hypothetical is modified so that this hypothetical person could learn one to two steps immediately by demonstration but would need a full thirty days to learn up to the six or seven step operations. (R. 896). Searles responded that he did not think that there would be any effect. (R. 897). Searles then testified that as far as he could tell, Radke's testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (R. 897). Searles also testified that his own testimony was consistent with the DOT. (*Id.*).

On cross examination, Corder's attorney questioned Searles about the general education and language requirements for the library clerk jobs. (R. 898). Searles testified that he was sure that there is a language requirement but that he was not sure what the requirement is. (*Id.*). Searles went on to say that the reading level probably has to be at least at the third grade level and that, in his opinion, that meant someone who can read a newspaper. (R. 899). Searles added that he believed that newspaper writers write articles

8

with a third grade reading level in mind. (R. 900).

The ALJ interrupted Searles' cross examination and asked Searles to respond to the following hypothetical: simple, unskilled tasks on the light occupational base; no concentrated pulmonary irritants; functionally illiterate. (R. 903). Searles stated that he could identify two occupations that would be unskilled; at the light exertional level with no concentrated pulmonary irritants; and do not require any high level of reading or writing, which he considered illiterate: production assembler (79,050 jobs) (DOT 706.687-010); and parking lot attendant (1,800 jobs) (DOT 915.473-010). (R. 904). Searles derived the number of jobs from his own knowledge of the labor market in Chicago.[4] (R. 906). Searles stated that the production assembly jobs may possibly consist of assembling toys, plastic parts or sub-assembly. (R. 904). Searles opined that the production assembler job probably involved three to five steps and required at least some language and math requirement and that the parking lot attendant does not have a literacy requirement. (R. 905-06). With respect to the parking lot attendant jobs, Searles stated that employers utilize enclosures to protect employees from weather and irritants and that most of the time, there is some kind of ventilation inside the shelter. (R. 907).

At the hearing, Corder's attorney requested that the ALJ require Searles to provide a copy of the CBP that Searles referred to in his testimony. (R. 908). The ALJ stated, and

---

[4]Earlier in the hearing, Corder's attorney asked Searles where he came up with the number of available jobs. (R. 906). In response, Searles stated that he relied on the County Business Patterns (2000) ("CBP"). (*Id.*). However, Searles went on to say that the CBP provides categories of jobs but does not provide information concerning the specific number of production assembly or parking lot attendant jobs. (R. 907). Searles testified that he also relied on the Occupation Outlook Quarterly for both of the jobs that he himself identified but that neither publication included specific requirements in terms of general reading or math ability. (R. 906-08).

Searles concurred, that the document was publicly available and that Corder's attorney could obtain the document on his own. (*Id.*). In a series of follow-up letters to the ALJ, Corder's attorney stated that he was unable to find the specific information that Searles relied on and reinstated his request that Searles provide him with the documentation. (R. 861-63, 868). The ALJ denied this request. (R. 784).

**Standard of Review**

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. §405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 28 L. Ed. 2d 842, 91 S. Ct. 1420 (1971)). We must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." (*Id.*). While the ALJ "must build an accurate and logical bridge from the evidence to [his] conclusion," he need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ must "sufficiently articulate [his] assessment of the evidence to 'assure us that the ALJ considered the important evidence…[and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985)).

**Legal Analysis**

Whether a claimant qualifies to receive SSI depends on whether the claimant is "disabled" under the Social Security Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter,* 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." (*Id.* at 886).

**Decision of ALJ Dougherty**

In her formal findings, the ALJ found the following:

1) The claimant has not engaged in substantial gainful activity since his alleged disability onset date.

2) The claimant's impairments significantly limit his ability to perform basic work activities.

11

3) The claimant's condition does not meet or equal any listing in Appendix 1 to Subpart P, Regulation No. 4.

4) The claimant's complaints of disabling symptoms and limitations were not entirely credible.

5) The claimant has been capable of all work activity except for the following: lifting more than 20 pounds occasionally or more than 10 pounds frequently; more than simple, unskilled job tasks, and tolerating exposure to concentrated pulmonary irritants.

6) The claimant is unable to perform any past relevant work.

7) The claimant is capable of performing other jobs that exist in significant numbers in the national economy (rule 202.18 as a framework, supplemented by VE testimony).

8) The claimant is not "disabled."

(R. 784-85).

**Corder's Mental Capacity**

In her 2005 decision, the ALJ relied on Dr. Schiff's testimony when she concluded that Corder has the RFC to perform all work activity except for more than simple, unskilled job tasks.[5] (R. 781-82, 785). The ALJ acknowledged that Dr. Schiff was unfamiliar with the subtest scores of the WAIS-R. (R. 782). The ALJ also noted that Corder's attorney challenged Dr. Schiff's testimony about Corder's subtest scores both at the hearing and in a post-hearing letter. (*Id.*). Nevertheless, the ALJ determined that "the suggestion in attorney Schultz' challenge that the dissection of subtest scores is necessary to derive

---

[5] In the "Findings" section of the decision, the ALJ found that "[t]he claimant has been capable of all work activity except for the following: lifting more than 20 pounds occasionally or more than 10 pounds frequently; more than simple, unskilled job tasks, and tolerating exposure to concentrated pulmonary irritants." (R. 785). In the body of the decision, the ALJ stated that "[t]o the extent not inconsistent with the evaluation here the RFC assessment contained in the prior decision is remains [*sic*] applicable and is hereby incorporated by reference." (R. 782). In the prior decision, the ALJ found that Corder had the RFC to perform a limited range of light work, provided that he was not required to understand, remember or carry out more than simple instructions. (R. 478).

12

broader conclusions about the claimant's functioning level in the general terms of unskilled employment presumes a precision inherent in such an inquiry that likely does not exist. In any event, attorney Schultz has not provided a sufficient cause to look deeper." (*Id.*).

Corder contends that the ALJ's finding that his subtest scores could not give a broader understanding of his impairments was impermissibly based on her own medical judgment.[6] We agree. An ALJ cannot substitute her judgment for that of a doctor by independently evaluating medical evidence. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). Here, the ALJ improperly made an independent medical determination by evaluating Corder's subtest scores and concluding that the subtest scores would not affect his functional capacity. Dr. Schiff admitted that he was not familiar with subtest scores, that he was unfamiliar with the material; and that he was not an expert in subtest scores. (R. 878-83). Notably, Dr. Schiff could not explain the verbal test of Comprehension, (R. 879-80), and Dr. Schiff testified that in the past, he had not made correlations between subtest scores and an individual's functional capabilities. (R. 882). In short, the ALJ's conclusion that Corder's functional abilities could be adequately assessed without an analysis of Corder's subtest scores is not supported by substantial evidence.

In addition, the ALJ's determination that Corder's attorney did not provide "sufficient

---

[6] In clarifying his position, Corder's Reply brief states that based on Dr. Schiff's testimony with respect to IQ subtest scores, the ALJ should not have relied on his testimony in this area; that Drs. Gardner and Diamond administered and interpreted the IQ tests and subtest scores and reported consistent opinions; and that the ALJ should have credited these opinions over Dr. Schiff's opinion because he was not an expert in IQ subtests. (Pl.'s Reply, p. 6). It is unclear to this Court if Corder's subtest scores are important to an evaluation of Corder's functional capacity, if they accurately reflect Corder's functional capacity or if they will ultimately affect an evaluation of Corder's functional abilities. That analysis and determination should be made by a medical professional with experience evaluating subtest scores, not by this Court. Therefore, we will not address Corder's argument that the ALJ should have given more weight to the opinions of Drs. Gardner and Diamond than that of Dr. Schiff.

cause" to look deeper into this issue is not accurately reflected by the record. After reviewing the record, Dr. Schiff was not able to analyze and conclusively determine if Corder's subtest scores affected Corder's functional capacity because Dr. Schiff was not familiar with the material. (R. 878-83). Therefore, despite the ALJ's conclusion to the contrary, Corder's attorney did provide the ALJ with "sufficient cause" to look deeper into this issue. Based on this record, a third remand is required. *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993). On remand, the ALJ must fully consider the evidence concerning Corder's non-exertional limitations with respect to his subtest scores achieved on the WAIS-R IQ test in an assessment of Corder's RFC.

**Award of Benefits**

There are unresolved factual issues that preclude a reliable decision regarding Corder's eligibility for benefits. Accordingly, we reject the claimant's arguments that an award of benefits is appropriate at this time, and to this extent, Corder's motion is denied.

**Remand to a new ALJ**

This is the second decision that ALJ Dougherty has issued denying Corder benefits. On remand, this Court strongly urges the Social Security Administration to reassign this case to a new ALJ. The tone of the ALJ's two prior decisions suggest that she may be committed to the denial of Corder's claim. *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996) (cases reversed for ALJ bias automatically transfer to a different ALJ on remand); *Ventura v. Shalala*, 55 F.3d 900, 904-905 (3rd Cir. 1995 ) (same).

**Conclusion**

Based on the foregoing, the ALJ improperly made an independent medical determination when she evaluated the effect of Corder's subtest scores on his functional capacity. Therefore, the ALJ's finding as to Corder's mental residual functional capacity is not supported by substantial evidence. The Commissioner's motion for summary judgment is denied. Because unresolved factual issues remain, we decline to award benefits at this time. Thus, Corder's motion for summary judgment granted in part and denied in part. The case is remanded to the Social Security Administration for further proceedings consistent with this order. It is so ordered.

ENTER:

_____

**MICHAEL T. MASON**

**United States Magistrate Judge**

**Dated: July 19, 2007**